Robert J. McKennon (SBN 123176) *rm@mckennonlaw.com*
Joseph S. McMillen (SBN 174561) *jm@mckennonlaw.com*
**MCKENNON LAW**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorney for Plaintiff Ryan Pratt



# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| RYAN PRATT,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY; and DOES 1 through 10, inclusive,<br><br>　　　　　Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br>_____<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>　-　Civil Cover Sheet;<br>　-　Summons; and<br>　-　Certification of Interested Parties] |

# NATURE OF ACTION

1.    Plaintiff Ryan Pratt ("Plaintiff" or "Mr. Pratt") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq., to recover benefits wrongfully denied under his accident insurance policy issued and administered by Hartford Life and Accident Insurance Company ("Hartford").

2.    Hartford has wrongfully denied Plaintiff's claim for permanent total disability benefits under the policy despite overwhelming evidence that Mr. Pratt has been totally and permanently disabled since July 4, 2020, following a catastrophic motor vehicle accident.  Hartford in its highly egregious denial decision ignored all of Plaintiff's medical providers' opinions that he is and was totally and permanently disabled, independent doctors adverse to Plaintiff with the same opinion, and it even ignored its own consulting physicians' opinions in reaching its denial decision.  Plaintiff seeks to have this Court render a decision that Plaintiff is entitled to his total and permanent disability benefits under the policy in the amount of $1,000,000, and to award him his attorneys' fees, costs, and interest on his past-due benefits.

# THE PARTIES

3.    Plaintiff is an individual who, at all times relevant to this action, was a citizen and resident of the City of Newport Beach, Orange County, State of California.  At all relevant times, Plaintiff was a participant and beneficiary of the Johnson & Johnson ("J&J") employee welfare benefit plan ("Plan"), which provided various benefits including Hartford's accidental death and dismemberment ("AD&D") policy at issue here that includes total permanent disability benefits.

Case No.: 

4.      Defendant Hartford, at all relevant times administered the accident insurance policy benefits provided to Plan participants, including Plaintiff, by issuing group policy number ADD-S09077 to J&J (the "Plan" or "Policy"), Plaintiff's former employer.  That Policy promised to pay permanent total disability ("PTD") benefits in the amount of $1,000,000 to Plaintiff should he become totally and permanently disabled.  Hartford was and is a fiduciary of the Plan within the meaning of ERISA.

5.      The true names and capacities, whether individual, corporate, associate or otherwise of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sue DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained; DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment.  Plaintiff is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiff as hereinafter alleged. Plaintiff will amend this Complaint once their identities are ascertained.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction under 29 U.S.C. §1132(e) and 28 U.S.C. §1331.

Case No.:



7.      Venue is proper under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because Plaintiff resides in this district, the breach occurred in this district, and the Plan is administered in this district.

## FACTUAL BACKGROUND AND ARGUMENTS

### A.    The Plan/Policy

8.      Pursuant to the terms and conditions of the Plan, Plaintiff is entitled to PTD benefits because, at all times relevant, he met and continues to meet the Plan's operative definition of "Permanently and Totally Disabled" and the other conditions necessary to qualify for his benefits. The Summary Plan Description provides as follows:

Accident insurance pays a benefit if you or an enrolled family member die, lose a limb, suffer a total and permanent disability, or suffer another covered Loss as a result of an accident. The benefit for death or total permanent disability is 100% of your coverage.

**BENEFITS PAYABLE UNDER THE PLAN**
The chart below outlines the benefits payable under the Employee Accident and Dependent Accident Insurance Plans. You (or your beneficiary) will be paid the percentage shown, as long as the Loss occurs within 365 days of the date of the accident. . .

For a benefit to be payable, the Loss must be suffered within 365 days after the date of the covered accident and the claim for benefits must be furnished to The Hartford Life and Accident Insurance Company (The Hartford) within 90 days after the date of the Loss or as soon as reasonably possible.

No more than 100% of the coverage elected will be paid for multiple Losses resulting from the same accident.

**Total and Permanent Disability (for you only) …………...100%**

**Permanent Total Disability Benefit**
If, due to a covered accident, you are permanently and totally disabled as determined by The Hartford, the Plan will pay your full coverage amount after a 12-month waiting period. For this benefit to be payable, the total and permanent disability must begin within 365 days of the date of the accident, last continuously for 12 consecutive months, and



1  must be considered total, continuous and permanent at the end of that 12-consecutive month period. "Disabled" means your inability to perform the material and substantial duties of any occupation for which you are suited by education, training and experience. This benefit terminates at age 70.

9.    The Plan and, specifically, the Policy provides:

Permanent Total Disability Benefit: When is the Permanent Disability Benefit payable?
If You are Disabled and Your Disability:
1. resulted from Injury You received before You attained the Age Limit; 2. began within the Disability Commencement Period after the accident; 3. continued without interruption for at least the Qualification Period; and 4. is reasonably expected to continue without interruption until You die.[1]

The Policy defines "Disabled" or "Disability" as "Your inability to perform the material and substantial duties of any occupation for which you are suited by education, training and experience."

**B.    Plaintiff's Occupation**

10.    Before his accident, Plaintiff worked as a surgical orthopedic implants' consultant/technician, a highly demanding occupation that required him to stand for long hours in operating rooms, to move and lift equipment weighing up to 100

_____

[1] Hartford, Plaintiff's former employer J&J, nor anyone provided Plaintiff with a copy of the Policy that includes this language. He was provided with the Summary Plan Description and told that it was the operative Plan document. Therefore, this Policy language does not apply, including the fourth requirement (that a claimant's disability "is reasonably expected to continue without interruption until You die") because it is only in the Policy, not the Summary Plan Description. As alleged below, Plaintiff easily meets that condition anyway according to all the physicians that examined him. Hartford improperly relied on this Policy provision in its denial letters because it is not contained in the operative Plan document provided to Plaintiff. Hartford misrepresented the Plan's terms by requiring proof that Plaintiff would be disabled "until death." Hartford blatantly misrepresented its operative Plan provisions and then relied on this falsity to deny Plaintiff's claim. The Ninth Circuit has long held that an insurer may not apply an interpretation that imposes a heightened standard of proof beyond the policy language. *Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455, 458 (9th Cir. 1996) (administrator abused discretion by rewriting plan language). Hartford's "until death" requirement unlawfully rewrote the Plan since the Policy was never provided to Plaintiff.

Case No.:

pounds, and to provide real-time technical support to surgeons in trauma and orthopedic procedures.  This occupation requires exceptional stamina, focus, and fine motor skills in a high-pressure medical environment.  Plaintiff's injuries have permanently prevented him from performing the essential duties of this occupation (and, more importantly, any type of occupation for which he qualifies based on his experience).

11.    An orthopedic surgeon, Michael Moheimani, M.D., who performed an independent medical exam ("IME") on Plaintiff, stated in his December 2, 2020 QME/IME report that he was intimately familiar with Plaintiff's job description because Dr. Moheimani regularly utilized representatives of an implant company during his orthopedic surgeries, and that Plaintiff's occupation requires perfect function of the neck and back because of the prolonged standing and lifting duties:

> His job analysis has been reviewed, and furthermore, I am well familiar with the type of work he does as a representative for an implant specialty company. Usually, when I do any type of complex surgical procedure, which requires implantation, whether in the cervical spine, lumbar spine, or extremity, we ask the representatives to be present in the room.  These surgeries may go anywhere from 30 minutes to 12 hours. During this time, the technician must be available at all times to answer technical questions if any difficulties are encountered.  He has to have available instrumentation for the procedure.  This requires bringing many trays of heavy surgical equipment to the site, where they are autoclaved, and made ready for the surgeon.  It is noted that in the job description provided, requirements are for frequent lifting of even 100 pounds.  These trays can be very heavy, they have to be carried, and placed in an autoclave, and then he takes them back, usually on a stroller, and has to place them in his vehicle.  Sometimes, the representatives go from hospital to another and from one procedure to another, in a day.  They are sometimes called in for emergency cases after hours.  I have operated sometimes at 2 or 3 in the morning, and the representative is always available. Therefore, this is a job that really requires perfect function of the neck and back because of the prolonged standing, and lifting requirements.

Case No.:



### C.  Plaintiff's Accident and Permanent and Total Disability

12.  On July 4, 2020, Plaintiff was involved in a devastating motor vehicle accident that left him with lifelong severe and permanent injuries to his spine, nerves, and musculoskeletal system.  He was driving southbound on PCH when a northbound driver suddenly made a left turn and struck his driver's side door with such force, at about 45 mph, that it pushed his car sideways to collide with the far-right corner light post.  The collision caused his left side to strike the driver's door of his vehicle on impact with great force.  His car was severely damaged, a total loss, especially the driver's side where he was sitting.  He sustained permanent spine injuries all along his neck and back that have disabled him from working for life.

13.  Since the accident, Plaintiff has suffered from constant, debilitating pain in his cervical, thoracic, and lumbar spine, with radiculopathy (pinched nerves that radiates excruciating pain to his extremities), muscle spasms, numbness, tingling, weakness, antalgic gait, and severe limitations in walking, standing, sitting, lifting, bending, twisting, and performing fine motor tasks.

14.  Plaintiff's disabling symptoms have not improved or resolved, and he has permanent restrictions and limitations on his ability to perform the material and substantial duties of any type of occupation, including his own as a surgical orthopedic implants consultant/technician.

15.  In his July 17, 2021 personal statement regarding his daily living activities, Mr. Pratt listed the following restrictions and limitations:

> My job as an orthopedic trauma sales consultant for nearly 20 years was standing and moving quickly every day, often after hours, weekends, holidays, non-stop.  It also required me to move 100's of pounds and equipment on a daily basis.  None of these tasks are

Case No.:



something I can do now.  Sleep is very difficult with throbbing pain throughout my lower back and sides every night.  It feels like I have been beaten with a bat on the bone surfaces.  There is a lot of spasms (muscle) associated as well.  If I walk too far, I get a debilitating shock.  Household activities typically require standing for periods of time, repetitive twisting of the torso, as well as bending and kneeling.  All these activities range from very uncomfortable to excruciating.  I only use a desktop sparingly because my right hand goes numb in minutes and my shoulder begins to ache.

16.    After extensive evaluations and treatment, Plaintiff's treating physicians agree that his restrictions and limitations disable him from working in any occupation and are permanent and reasonably expected to continue without interruption through the end of his life.

17.    As a result of his injuries, Plaintiff now requires a cane to walk and cannot sit or stand for more than a few minutes without severe pain.  He cannot lift more than 10 pounds, struggles to maintain concentration due to constant pain, and requires frequent rest periods.

### D.    Plaintiff Has Provided Overwhelming Medical Evidence from Physicians Proving his Permanent and Total Disability

18.    Plaintiff has been regularly examined in person for years by several treating physician specialists since shortly after his July 2020 car accident.  Plaintiff's long-standing treating pain management specialist, Richard Paicius, M.D., is one such physician.  In numerous medical certifications, Dr. Paicius repeatedly concluded that Plaintiff is permanently and totally disabled from performing the duties of any occupation, including his own.  He emphasized that the degenerative nature of Plaintiff's spinal conditions, combined with chronic pain and radiculopathy, make meaningful improvement highly unlikely.



19.   Dr. Paicius consistently and repeatedly opined that Plaintiff is permanently and totally disabled from working.  Dr. Paicius concluded that Plaintiff's restrictions prevent him from engaging in gainful employment of any kind.  In his medical records, he noted the following diagnoses: (1) spinal stenosis in the lumbar region with neurogenic claudication (M48.062); (2) pain in thoracic spine (M54.6); (3) spondylosis without myelopathy (M47.816); (4) vertebrogenic low back pain (M54.51); (5) radiculopathy, cervical region (M54.12); (6) radiculopathy, lumbar region (M54.16); (7) cervicalgia (M54.2); (8) other spondylosis (M47.896); (9) intervertebral disc degeneration (M51.36); and (10) radiculopathy, thoracic region (M54.14).  Dr. Paicius' medication treatment plan included (and continues to include) prescriptions for strong narcotic opioid pain medicine for severe pain, other general and nerve pain medications, and muscle relaxants, i.e., Nucynta (IR and ER), Ibuprofen (prescription strength Tylenol), Gabapentin, and Flexeril (Baclofen), along with over the counter natural and herbal pain management supplements.

20.   In his disability certification letter dated June 18, 2025, Dr. Paicius explained that Plaintiff has had minimal pain or symptom relief since his car accident despite regular treatment.  He also explained why, in his professional medical opinion, Plaintiff is and will be permanently and totally disabled from working in any type of occupation for the rest of his life, including his numerous permanent functional capacity restrictions and limitations:

> It is my professional medical opinion that Ryan's pain and associated symptoms constitute permanent impairments that are expected to last for his entire life.  Ryan is permanently disabled because his pain and disabling symptoms are present constantly and are severe enough to interfere with the attention and concentration needed to perform even simple work tasks during a typical workday, preventing Ryan to return to gainful employment.  Ryan has permanent restrictions and limitations on bending over, climbing stairs, riding, using a computer, standing for prolonged period[s] of time or more than 20 minutes, sitting for prolonged periods of time, or walking for more than several



minutes and lifting objects more than 10 pounds. My assessment indicates that Ryan may lift up to 10 pounds occasionally but never lift more than 10 pounds. He has had restrictions and limitations to returning to work because he is unable to sit, stand, walk, and lift due to constant pain and there are no accommodations that could allow him to increase his work capacity.

21.    Plaintiff's conditions have been confirmed by objective evidence, including MRIs and diagnostic imaging, physical examinations, and a functional capacity evaluation.

22.    All physicians that diagnosed Plaintiff (and all independent medical examiners) reviewed the objective medical evidence, including the following MRIs, and agree that they show extensive, permanent degenerative changes which support their diagnoses (discussed above) and their conclusion that Plaintiff has disabling symptoms which will be continuous and permanent for the remainder of his life:

July 21, 2020 MRI of the cervical spine (impressions): (1) C3-4: 1mm retrolisthesis, 2mm diffuse disc bulge and uncovertebral hypertrophy resulting in minimal spinal canal stenosis and moderate bilateral neuroforaminal stenosis; (2) C4-5: 1mm retrolisthesis, 2mm diffuse disc bulge annular fissure, and uncovertebral hypertrophy resulting in mild spinal canal stenosis, mild right and moderate left neuroforaminal stenosis; (3) C5-6: 2 mm diffuse disc bulge, eccentric to the right, and uncovertebral hypertrophy resulting in minimal spinal canal stenosis, moderate left and severe right neuroforaminal stenosis; (4) C6-7 shows 3 mm diffuse disc bulge, minimal annular fissure, and uncovertebral hypertrophy resulting in mild spinal canal stenosis and moderate bilateral neuroforaminal stenosis.

July 21, 2020 MRI of the lumbar spine (impressions): (1) L2-3: 1 mm diffuse disc bulge and facet arthropathy resulting in mild bilateral neuroforaminal stenosis. Negative for significant spinal canal stenosis. (2) L3-4 shows 1 mm retrolisthesis. 3 mm central disc protrusion and facet arthropathy resulting in mild spinal canal stenosis and moderate bilateral neuroforaminal stenosis. (3) L4-5 shows 3 mm left paracentral disc protrusion, annular fissure, and facet arthropathy resulting in mild spinal canal stenosis, and moderate left subarticular recess stenosis, and moderate bilateral neuroforaminal stenosis. (4) L5-S1 shows 2 mm retrolisthesis, 3 mm central disc protrusion, minimal annular fissure, facet arthropathy, and ligamentum flavum redundancy resulting in severe bilateral subarticular recess stenosis and severe bilateral neuroforaminal stenosis.

Case No.:



May 10, 2021 MRI of the thoracic spine (impressions):
1. Mild-to-moderate degeneration at T5-6, T6-7, T7-8 and T8-9.
2. T6-7 shows 5 mm x 8 mm left central disc herniation abutting the left ventral cord and probably affecting the left-sided nerve at this level.
3. T7-8 shows 3 mm disc bulge abutting the ventral cord without significant central stenosis. No foraminal narrowing.

December 4, 2021 MRI of the cervical spine (impressions):
1. Suboptimal examination due to patient pain and discover leading to motion.
2. Mild-to-moderate degeneration at C3-C4, C4-C5, C5-C6 and C6-C7.
3. C3-C4: Mild-to-moderate central canal stenosis. Severe right and moderate left foraminal narrowing.
4. C4-C5: Severe left and moderate right foraminal narrowing.
5. C5-C6: Severe right and moderate left foraminal narrowing.
6. C6-C7: Moderate to severe bilateral foraminal narrowing.
7. C7-T1: 4 mm in AP and 10 mm in transverse right central disc herniation flattening the right ventral cord and probably affecting the right-sided nerve at this level. Mild central stenosis. Left foramina is patent.
8. T1-T2: 4 mm right central disc herniation flattening the right ventral cord probably affecting the right-sided nerve at this level.

December 4, 2021 MRI of the cervical spine (impressions):
1.  No significant change in comparison to previous examinations.
2.  C3-C4: Mild-to-moderate central stenosis. Severe right and moderate left foraminal narrowing.
3.  C4-C5: Severe left and moderate right foraminal narrowing.
4.  C5-C6: Severe right and moderate left foraminal narrowing.
5.  C6-C7: Moderate to severe bilateral foraminal narrowing.
6.  C7-T1: 4mm in AP and 10mm in transverse right central disc herniation flattening the right ventral cord and probably affecting the right-sided nerve at this level.
7.  T1-T2: 4 mm right central disc herniation flattening the right ventral cord probably affecting the right-sided nerve at this level.

23.    Gerald Alexander, M.D., a board-certified orthopedic surgeon, is another physician that has regularly treated Plaintiff for spine-related conditions. Dr. Alexander reviewed Plaintiff's imaging studies and found multi-level disc herniations, nerve root compression, and severe degenerative changes.  He confirmed that Plaintiff's accident caused irreversible impairments that have not responded to conservative treatments.  Dr. Alexander opined that Plaintiff cannot perform sedentary work due to severe pain and his inability to sit for extended periods (nor can he safely perform work activities that require prolonged standing, bending, or lifting).

Case No.:



24.    Carl Hess, M.D., a pain management physician and Plaintiff's third treating physician, has also regularly examined Plaintiff for his spinal injuries.  Dr. Hess administered several bilateral epidural steroid injections to Plaintiff in his lumbar spine at the following levels: L5-S1, L4-5 (right interlaminar), L3-4, and L2-3.  He also performed bilateral radiofrequency ablations of Plaintiff's lumbar facet joints at the same levels, which provided only transient pain relief.

25.    Dr. Hess certified Plaintiff's continued disabling medical conditions.  In his January 20, 2021 Attending Physician Statement, Dr. Hess opined that Mr. Pratt was and remained disabled from working.  He explained that Plaintiff had increased pain in his lumbar region and that he was unable to move without pain, which he documented was 10 out of 10.

26.    Dr. Hess ordered a nerve conduction study.  On November 13, 2020, Dr. Nahida Nazir, a specialist in such studies, completed it.  The objective medical test was abnormal.  The study showed objective evidence of: 1) denervation in Plaintiff's right median nerve (innervated muscle in his right hand); 2) a chronic right median sensorimotor axonal mononeuropathy at his right wrist, consistent with a diagnosis of severe right carpal tunnel syndrome; 3) a left median, sensory, demyelinative, mononeuropathy at Plaintiff's left wrist, i.e., mild left-sided carpal tunnel syndrome; 4) bilateral ulnar, sensory, demyelinative, mononeuropathy in both his wrists.

27.    Plaintiff has also been examined in person by several non-treating, independent physicians with no affiliation to Plaintiff and not hired by him or his representatives.  These physicians have no incentive to find in his favor.  But they did.  One such independent physician is Vlachos Katrina Vlachos, M.D, a physical medicine and rehabilitation specialist hired by Plaintiff's disability insurer,



Prudential Insurance Company of America ("Prudential").  *Dr. Vlachos is an independent physician from Prudential with no allegiance to Plaintiff* and, in fact, directly contrary interests to him.  Dr. Vlachos performed an IME of Plaintiff and reviewed his extensive medical records.  Dr. Vlachos opined, similarly to Plaintiff's treating physicians (Drs. Paicius, Hess, and Alexander), that Mr. Pratt's medical conditions are permanent, his disability is worsening, and that his future treatment, unfortunately, will be limited to managing his pain (not resolving his conditions which are untreatable and permanent):

> Based on the fact that he [Ryan] had not had any significant degree of improvement, he had declined in functional ability and continued to be disabled and exhibit significant pain behaviors, it is unlikely that there would be any significant improvement and my prognosis for him is fair to poor as to any improvements being likely.  He has developed several pain behaviors and has become increasingly disabled…Expected treatment at this stage would likely include pain management and medications.

28.    Dr. Vlachos concluded that Mr. Pratt's restrictions and limitations are permanent in nature in part because he has been unresponsiveness to extensive proper medical treatment:

> **It is my opinion also that the duration of these restrictions and limitations is likely permanent.** The examinee has had symptoms for over one year as a result of the motor vehicle accident on July 4, 2020. He indicates in history that he has had no relief from any of the treatments that have been recommended despite reasonable recommendations for medications, physical therapy, chiropractic and epidural injections. **Despite appropriate treatment, he feels that he has worsened, and it is likely that given his unresponsiveness to treatments that these restrictions and limitations are likely permanent.**  (Emphasis added)

29.    On December 2, 2020, another independent physician, Dr. Moheimani, performed an in-person IME and QME on Plaintiff and reviewed his medical records and MRIs.  In his December 2, 2020 exam report, Dr. Moheimani talked about Plaintiff's job: "The [surgical] technician is required to lift heavy objects and



is required to be standing throughout the surgery… This is the job that requires perfect function of the neck and back because of the prolonged standing and lifting requirements." Dr. Moheimani further explained that, in his opinion, Plaintiff cannot perform any type of job, whether full time or part time: "It is not realistic for him to return to an 8-hour job…. *He would not even be able to do a part-time job*." (Emphasis added). He "estimated" that Plaintiff might at most be able to work "four hours per day, with restrictions." Dr. Moheimani was not retained by Plaintiff (or Hartford). He is an independent orthopedic physician retained by others and has no financial or other interest or motive to give favorable opinions for Plaintiff.

30.    On March 8, 2023, occupational therapist Breana Buccheri examined Plaintiff and conducted a full functional capacity evaluation. Ms. Buccheri opined, based on her exam, that he has several functional capacity restrictions and limitations that would prevent him from working in any type of occupation, even a sedentary one where he just had to sit and type:

> Ryan could not walk a single city block without rest or severe pain. He could **only sit at one time for 20 to 30 minutes** and could only stand at one time for 5 minutes. **In an 8-hour working day, he could *sit and stand or walk* *for less than 2 hours*. He could not work with any accommodation** and needed assistance with a cane or other assistive device while walking. Ryan should never lift and carry in a competitive work situation with more than 10 pounds and could rarely lift and carry less than 10 pounds. He had significant limitations to reaching, handling of **fingering**, and could only grasp, turn, twist objects with his **hands and fingers for approximately 25% of the time of an 8-hour working day**, and could **never reach** with his arms. (Emphasis added).

31.    Ms. Buccheri's objective functional capacity evaluation is similar to all of the above physicians' opinions that Mr. Pratt's medical conditions are severe, permanent, and will disable him for the rest of his life. Thus, Mr. Pratt has submitted strong, objective evidence to Hartford that proves he is eligible to receive PTD benefits under the Policy.

Case No.:



32.    Collectively, the above stated physicians—each with different specialties in pain management, orthopedic surgery, neurology, rehabilitation, and spine surgery respectively—unanimously concluded that Plaintiff is permanently and totally disabled, even independent physicians with no incentive to side with Plaintiff.  Their opinions are consistent with objective findings, functional capacity limitations, and the Social Security Administration's ("SSA") and another disability insurer's (Prudential) fully favorable disability determinations (discussed below).

**E.    <u>Hartford Incorrectly Denied Plaintiff's Claim for PTD Benefits Based on Less Credible "Paper Reviews" of His Medical Records When Overwhelming Evidence, Including from Its Own Medical Consultants, Show He Is Permanently and Totally Disabled</u>**

33.    On March 5, 2025, Hartford denied Plaintiff's claim for PTD benefits on the grounds that he did not meet the Policy's requirements for permanent total disability (i.e., that he cannot perform the duties of any occupation and that said disability is reasonably expected to continue without interruption until he dies). Hartford reasoned that his medical records show that he "could work with light duty restrictions."  Hartford denied Plaintiff's claim even though one of its claims representatives made a damning admission in his December 9, 2024 claim log note. Hartford admitted that its *own* consulting physician concluded that Plaintiff's car accident caused him severe trauma, pain, nerve root impingement, and numbness in his cervical, lumbar, and thoracic spine radiating to all four of his extremities:

> The medical records do show significant findings in the cervical and lumbar spine with complete collapse at L5 S1. Findings are noted as severe in both the cervical and lumbar spine with cervical and thoracic spine and nerve compression noted. This most likely is causing deficits and limiting activities and causing pain, numbness, weakness and tingling to all 4 extremities, again there are both chronic and acute findings in the cervical and lumbar spine, the accident most likely causing the acute symptoms.
>
> There are both acute and chronic conditions noted and the chronic most likely aggravated by the MVA.



34.    On July 21, 2025, Plaintiff appealed Hartford's claim denial through his counsel.  Plaintiff submitted overwhelming evidence of his permanent and total disability, including updated medical records, the SSA's decision, treating physician certifications, the independent physicians' disability reports, and lay witness statements, including the evidence summarized in this Complaint.

35.    On September 2, 2025, Hartford upheld its denial and denied Plaintiff's appeal based upon speculation from its peer reviewer, Howard Grattan, M.D.  Dr. Grattan concluded that Mr. Pratt was and is totally disabled from working in any type of occupation, both part time and full time, from just after his 2020 car accident continuously through the date of his August 2025 report:

> No, the claimant does not maintain the functional capability to sustain full time or part time work activities on a consistent reliable basis as of 8/16/2020 to present [8/8/2025].  . . . The provider [Dr. Paicius] noted the claimant remains permanently disabled and cannot perform his own occupation as a surgical orthopedic trauma implants consultant/technician or any other occupation due to the severe pain in his neck, back, and lower extremities, coupled with ongoing limitations to his ability to stand, walk, sit, carry, lift, and manipulate objects with his fingers.  Given the claimant's extensive diagnostic findings, continued symptoms and severe physical findings with surgical interventions recommended, I agree with Dr. Paicius that the claimant is unable to sustain gainful employment during the timeframe under review.

Thus, the last five years and continuing.  Yet, Hartford still denied Plaintiff's claim based on Dr. Grattan's speculation.  After noting that Plaintiff had "multiple spinal injections" over the last five years but no surgery, Dr. Grattan speculated that additional spinal injections, as well as trying spinal surgeries, "would be expected to provide improvement in his reported symptoms and in his functionality" and, therefore, recommended that Hartford reevaluate Plaintiff's functionality in six months.[2]  However, after Dr. Grattan had just documented that Plaintiff's treating

---

[2] Dr. Grattan documented in his report that Plaintiff's physician had already treated him with "multiple spinal injections," but he had not improved over the five years

Footnote continues on next page…

Case No.:

physician, Dr. Paicius, concluded that he was permanently disabled, Dr. Grattan
declined to state that, in his opinion, future injections and surgeries would improve
Plaintiff's functionality *enough* such that he would no longer be permanently
disabled from working.  That is critical because, although Hartford explicitly asked
Dr. Grattan in its referral question 7 to "Please comment on the attending
physician's opinion of [Plaintiff's] functionality . . . and discuss any differences
with you[r] opinion," Dr. Grattan did not disagree with Dr. Paicius' (or any other
treating physicians') functionality opinion that Plaintiff was and is permanently
disabled from working in any type of occupation.  If Dr. Grattan disagreed in that
respect, he would have stated so in his report (because his client Hartford explicitly
asked him to and because permanent disability is the most important issue in this
case).  Because he did not, Dr. Grattan implicitly agreed to and acquiesced with
Plaintiff's treating physicians' opinion that their patient is permanently disabled
from working in any occupation.

36.     Despite Dr. Grattan's silence on the most important issue after Hartford
explicitly asked him to identify disagreement with Dr. Paicius, Hartford relied on
Dr. Grattan's rampant speculation (that surgery might improve Plaintiff's
functionality some, but not necessarily enough so that he could return to work), to
deny his appeal and claim for PTD benefits:

> We have reviewed all the medical records provided by his treatment
> providers and these records have been further considered by and
> independent physician, Dr. Grattan who supports restrictions and
> limitations to Mr. Pratt's function from August 16, 2020 [to August
> 2025 and continuing].  However, Dr. Grattan further opined that Mr.
> Pratt's compliance with the recommended spinal injections and
> surgeries would be expected to provide improvement in his symptoms
> and in his functionality, with reassessment around February 8, 2026.
> Therefore, we have determined that as improvement in Mr. Pratt's

from his accident.  Hartford's and Dr. Grattan's position that Plaintiff could improve
with additional injections is rampant speculation because he had not in five years,
especially because he has degenerative back and neck conditions that usually
worsen over time.

Case No.:

condition could occur with the recommended treatment as outlined by his providers, and further supported by Dr. Grattan, he would not satisfy the requirement of the Permanent Total Disability Benefit in that it requires in part that the disability is reasonably expected to continue without interruption until he dies.  As such, we have concluded he is not eligible for Permanent and Total Disability Benefits under the Policy and find the prior denial of his claim is supported, and his claim will remain closed.

Without much analysis, Hartford: (1) ignored its own peer reviewer's explicit conclusion that Plaintiff is, was, and had been totally disabled from working in any type of occupation *continuously for the last five years* (due to severe, *degenerative* cervical, thoracic, and lumbar spine problems, *even after trying several spinal injections*); (2) dismissed the SSA's independent medical expert's and administrative law judge's conclusions that Plaintiff was disabled from performing any occupation; and (3) speculated that additional spinal injections (and surgery) "could" improve Plaintiff's condition despite no evidence that those treatments would restore function (and, at least for injections, had not for five years).  Hartford speculated despite the fact that its own medical consultant, Dr. Grattan, when explicitly requested by Hartford to disagree with Dr. Paicius' functionality opinions (which would include his opinion that Plaintiff was and is permanently disabled from working in any occupation), declined to do so.[3]  Hartford's reliance on speculation about future surgery is improper under *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623 (9th Cir. 2009) and *Saffle*.  Courts have repeatedly held that administrators cannot deny claims based on conjecture about possible future improvements.

---

[3] Hartford took the position that Plaintiff is not permanently disabled because spine surgery might help him to recover where he could return to work.  Hartford's and its medical consultant's rampant speculation that Plaintiff's condition could improve with surgery adds a requirement for PTD that is not in the Plan documents, i.e., that a claimant have surgery before he is entitled to a permanent disability finding.  That is improper and an abuse of discretion under Ninth Circuit precedent.  *See Saffle*, 85 F.3d at 458.

-17-

Case No.:



37.    Hartford failed to provide Plaintiff with a full and fair review as required by ERISA because its denial was incorrect, inappropriate, unreasonable, arbitrary, and capricious.

38.    Hartford's denial decision ignored binding precedent that requires insurers to consider the Social Security Administration's disability findings. In *Montour*, 588 F.3d 623, the Ninth Circuit criticized Hartford specifically for disregarding an SSA decision that a claimant was disabled.  That court noted that the SSA applies a rigorous standard, and its disability finding is weighty evidence of disability in an ERISA case that a disability insurer cannot ignore.  As explained below in Section I., Hartford repeated the same misconduct here.

39.    Hartford failed to conduct a meaningful dialogue with Plaintiff.  It violated *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997), which held that ERISA requires "meaningful dialogue" and full disclosure of the reasons for denial.  Hartford gave only conclusory reasons as the basis for its denial.

40.    Hartford also ignored key evidence in its claim file which showed that Plaintiff has been permanently disabled since his car accident.  The evidence shows that his accident aggravated his existing medical conditions and caused new devastating injuries in his spine.  He has disc degeneration in his cervical and lumbar spine, spinal stenosis in the lumbar region with neurogenic claudication, pain in his thoracic spine, vertebrogenic low back pain, radiculopathy in his cervical and lumbar regions, intervertebral disc degeneration, and radiculopathy in his thoracic region.

Case No.:



41.     Hartford's interpretation of the medical records of Mr. Pratt's treating physicians is flawed and did not address the severe limitations and restrictions that his medical conditions have on his ability to stand, sit, walk, lift, carry, or manipulate fine objects for extended periods of time.  These restrictions have left him wholly unable perform the duties of any occupation (or to assist with surgeries at his occupation as a surgical orthopedic implants' consultant/technician).

42.     Hartford failed to review or give credit to relevant medical records from Plaintiff's treating physicians and independent medical examiners.  The independent medical evaluations were conducted by the SSA, Prudential (in connection with another disability claim Mr. Pratt filed), and others with no affiliation with Plaintiff.  These records show restrictions and limitations that prevent Mr. Pratt from working.  And that his medical conditions caused total, continued, and permanent disability that will last his entire life.

43.     Hartford hired a biased physician consultant, Christopher Balint, D.O., to review Mr. Pratt's medical records when evaluating Plaintiff's initial claim for benefits.  Dr. Balint failed to conduct any peer review consultations with any of Mr. Pratt's treating physicians.  But even Dr. Balint's report favors Plaintiff.  In his February 18, 2025 report, Dr. Balint supported permanent restrictions and limitations when he stated that "Long term restrictions would be indicated."  When asked the question "Is it reasonably expected to continue without interruption until he dies?" he responded that while his pain may be alleviated somewhat by surgery, "He most likely will still have periods of exacerbating pain long term. [P]rognosis is guarded."

44.     Hartford ignored objective and subjective evidence to reach its decision because it did not list his job duties correctly and did not identify the presence of permanent restrictions and limitations in light of these job duties.

45.     Plaintiff provided evidence that surgery would not improve his medical condition, and could, in fact, even worsen it.  Both of his treating physicians and qualified medical examiners opined that surgery was not suitable for a patient with the level of degeneration that Plaintiff had.  Dr. Paicius, who has treated many patients with similar medical conditions and symptoms to Mr. Pratt, personally observed and opined that surgery in his situation would provide limited, if any, pain relief.  In his disability certification letter, Dr. Paicius stated the following about surgical options:

> However, I have advised Ryan of the uncertainty of such medical procedures and the risks and benefits, which may not bring a meaningful relief to his pain symptoms. Dr. Alexander noted that Ryan's car accident injury certainly aggravated his pre-existing conditions. Moreover, Ryan's radiculopathy in the thoracic region has mild to moderate degeneration at T5-T6, T5-T7, T7-T8, and T8-T9 levels, and the T6-T7 level has a 5 mm in AP and 8 mm in transverse left central disc herniation abutting the left ventral cord and probably affecting the left sided nerve at this level. Ryan's T7-T8 level has a 3mm disc bulge abutting the ventral cord, which all indicate advanced degeneration and low likelihood of correction with surgery. The costs of the estimated surgeries are over $330,000, and the success is uncertain because Ryan's medical conditions in other patients I have observed have shown little improvement with surgical intervention. Moreover, Ryan's advanced symptoms and damage has advanced to a stage that will be increasingly difficult to correct with surgical intervention, as noted by the two prior independent medical examiners Drs. Vlachos and Moheimani, and I agree with their opinions.

46.     Based on Mr. Pratt's response to the appropriate medical treatment he had received since July 2020, Dr. Paicius opined that Plaintiff would continue to experience the current symptoms and that he was permanently disabled and not able to return to work with any accommodation.  He opined that his permanent disability status would almost certainly last for the remainder of his life.  Dr. Paicius based his



opinions on his personal observations after Mr. Pratt's pain management procedures produced only transient and limited relief after several years of treatment.

47.    *An independent physician from Prudential with no allegiance to Plaintiff* and, in fact, directly contrary interests to him, Dr. Vlachos, opined after an in-person IME, that Plaintiff had received appropriate treatment and testing for his disabling symptoms, and that he had indications for restrictions and limitations due to his cervical and lumbar pain to sitting, standing, walking, reaching, climbing, balancing, stopping, kneeling, and crawling, with the exception of his ability to occasionally walk short distances with the use of a cane, and reach at desk level occasionally.  Dr. Vlachos concluded that Plaintiff might not work in any capacity at that point.

48.    Prudential's medical consultant Dr. Vlachos opined (similarly to Plaintiff's treating physicians), that his medical conditions were permanent, his future treatments were limited to pain management, and there would likely not be any improvement in his conditions:

> Based on the fact that he [Ryan] had not had any significant degree of improvement, he had declined in functional ability and continued to be disabled and exhibit significant pain behaviors, **it is unlikely that there would be any significant improvement and my prognosis for him is fair to poor as to any improvements being likely**. He has developed several pain behaviors and has become increasingly disabled…Expected treatment at this stage would likely include pain management and medications.  (Emphasis added.)

49.    Dr. Vlachos opined that Mr. Pratt's restrictions and limitations are permanent in nature and that his unresponsiveness to treatment was a determinative factor in her analysis:

> **It is my opinion also that the duration of these restrictions and limitations is likely permanent.** The examinee has had symptoms for



over one year as a result of the motor vehicle accident on July 4, 2020. He indicates in history that he has had no relief from any of the treatments that have been recommended despite reasonable recommendations for medications, physical therapy, chiropractic and epidural injections. **Despite appropriate treatment, he feels that he has worsened, and it is likely that given his unresponsiveness to treatments that these restrictions and limitations are likely permanent.** (Emphasis added)

50.     Hartford's peer review report from Dr. Balint supports Plaintiff's arguments (that he has been permanently disabled for at least five years since 2020). Dr. Balint implicitly agrees with Plaintiff's treating providers and the truly independent medical exam from Dr. Vlachos (hired by Prudential).

51.     As noted above, after Plaintiff submitted his appeal, Hartford retained Dr. Grattan, a pain medicine and physical medicine and rehabilitation physician, who did not examine Mr. Pratt in person and simply performed a cold "paper review" of the medical records submitted.  Even though Dr. Grattan lacked the benefit of an in-person exam or peer review consultation with Mr. Pratt's physicians, he still implicitly concluded in his report that Mr. Pratt had permanent restrictions and limitations on returning to either full-time or part-time work schedule from August 16, 2020 to the present.

52.     Dr. Grattan agreed that Mr. Pratt's medical evidence supported his subjective pain complaints.  In his report, Dr. Grattan stated the following in response to Hartford's referral question 2 about Plaintiff's pain complaints and work functionality:

> **2. In your opinion does the evidence support his pain complaints, and if so, how would this impact his function in a work environment, including but not limited to his ability to focus/concentrate on work tasks? Please detail your findings.**
>
> Yes, the evidence supports his pain complaints. The claimant's complaints are supported by both examination and diagnostic findings, which highlight significant physical limitations. The claimant's



diagnostic imaging highlights findings including but not limited to severe carpal tunnel syndrome on the right, mild carpal tunnel syndrome on the left, ulnar, sensory, demyelinative, mononeuropathy at both wrists, spinal disc herniations abutting the ventral cord, severe lumbar degenerative disease, and lumbar and cervical disc protrusions. The claimant's limitations in cervical and lumbosacral range of motion, decreased sensation in the anterior distal thumb and middle finger C6-7, L4-5 and lateral leg and dorsum of the foot, positive straight leg raise, and antalgic gait with notation that he is in mild distress correlates with the severe diagnostic evidence and supports the presence of his chronic pain that would impact his ability to function in the work environment, including but not limited to his ability to focus/concentrate on work tasks.

53.     Hartford's conduct is inconsistent with *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), which recognized that, while treating physician opinions are not entitled to automatic deference, administrators cannot arbitrarily refuse to credit them.

54.     By ignoring its own reviewers, Hartford acted even more egregiously. Dr. Grattan concluded Plaintiff's restrictions were permanent and precluded work. Hartford dismissed this conclusion without explanation.  Courts have held such selective review of evidence is arbitrary and capricious.  *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008).

55.     Moreover, Hartford requested that Plaintiff respond to Dr. Grattan's peer review.  Plaintiff provided a responsive letter on August 25, 2025 indicating that Dr. Grattan in fact agreed with Plaintiff's physicians' opinions that Plaintiff has had permanent disabling medical condition since July 2020 and indicated the inconsistencies in Hartford's interpretation and cherry picking of the medical conclusions of its own expert.

56.     Based on the updated claim file, Hartford never presented Plaintiff's peer review response letter to Dr. Grattan.  Harford never asked him to clarify his medical opinions based on Plaintiff's arguments in his letter.

Case No.:



57.    Instead, on September 2, 2025, Hartford upheld its denial of Plaintiff's benefits.  The notes from the claim file specifically indicate that Hartford's appeal reviewers failed to properly administer the claim when they made the decision not to consult Dr. Grattan regarding Mr. Pratt's peer review response letter:

> Rec'd response from Atty. Meier to the shared info and she continues to argue that Mr. Pratt is eligible for PTD benefit under the policy. Upon review of all the info contained in the claim file, the IMR opinion and response from Atty. Meier, proceeding with the appeal determination. Based upon review of all the information, while r/l's are supported for the period in question, 8/16/20, Dr. Grattan further states, that compliance with the recommended spinal injections and surgeries would be expected to provide improvement in his symptoms and in his functionality, with reassessment around 2/8/26. Therefore, as improvement in his condition could occur with the recommended treatment, he would not satisfy the requirement of the Permanent Total Disability Benefit in that it requires in part that the disability is reasonably expected to continue without interruption until he dies, and as such, he does not qualify for the Permanent Total Disability Benefit provisions of the policy. Consequently, the denial of the claim will be upheld on appeal.

**F.    <u>Hartford's Benefits Decision Was Incorrect Because It Ignored the Opinion of Its Own Medical Consultant, who Agreed with Plaintiff's Treating Specialists, that He Is Totally and Permanently Disabled</u>**

58.    Hartford dismissed or minimized the opinions of Plaintiff's treating physicians and the independent physicians from Prudential without any reasoned explanation, in violation of ERISA's requirement for a full and fair review.  The Ninth Circuit has held that disregarding consistent treating physician findings while relying on biased paper reviews is arbitrary and capricious.  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011).  In *Salomaa*, the court stated that the plan administrator's decision was illogical, implausible, and without support in inferences that could reasonably be drawn from facts in the record, because: (1) every doctor who personally examined Salomaa concluded that he was disabled; (2) the plan administrator demanded objective tests to establish the existence of a condition for which there are no objective tests; (3) the administrator failed to consider the Social Security disability award; (4) the reasons for denial

Case No.:



shifted as they were refuted, were largely unsupported by the medical file, and only the denial stayed constant; and (5) the plan administrator failed to engage in the required "meaningful dialogue." *Id.* at 679.

59.    Hartford's refusal to credit the opinions of Plaintiff's treating and Prudential's independent physicians and other providers is particularly egregious given that **its own peer reviewer, Dr. Grattan,** board certified in physical medicine and rehabilitation and pain medicine, **also implicitly concluded that Plaintiff had permanent restrictions and limitations preventing any type of gainful employment (as did its other consultant Dr. Balint as explained above).**  Rather than adopt its own reviewer's findings, Hartford ignored them, evidencing its bias and conflict of interest.

60.    When asked to provide his assessment of reasonably supported restrictions and limitations of Mr. Pratt as of August 16, 2020 to present (August 2025), Hartford's peer review consultant Dr. Grattan agreed that he has permanent sitting, computer, standing, and several other restrictions:

> The claimant has permanent restrictions and limitations on bending over, climbing stairs, driving, using a computer, standing for prolonged period of time or more than 20 minutes, sitting for prolonged periods of time, or walking for more than several minutes and lifting objects more than 10 pounds occasionally. The provider noted the claimant remains permanently disabled and cannot perform his own occupation as a surgical orthopedic trauma implants consultant/technician or any other occupation due to the severe pain in his neck, back, and lower extremities, coupled with ongoing limitations to his ability to stand, walk, sit, carry, lift, and manipulate objects with his fingers.

61.    Dr. Grattan also noted that Mr. Pratt's physician Dr. Paicius opined that Mr. Pratt **"remained permanently disabled because his pain and disabling symptoms were present constantly and were severe enough to interfere with the attention and concentration needed to perform even simple tasks during a**



1  **typical workday, preventing the claimant to return to gainful employment."**

2  (Emphasis added.)  Dr. Grattan did not take issue with Dr. Paicius' medical

3  conclusion.  He did not dispute those medical opinions in his peer review report

4  despite the fact that Hartford explicitly asked him to explain any disagreements he

5  had with Plaintiff's treating physicians (thus including Dr. Paicius).  The reasonable

6  inference from this evidence is that Dr. Grattan agrees with Dr. Paicius' permanent

7  disability opinion.  Hartford's own peer reviewer appears to agree with Mr. Pratt's

8  treating physicians' medical opinions that he has been permanently and

9  continuously disabled since August 16, 2020.

10

11      62.    Similarly, Dr. Grattan did not dispute or attempt to refute Plaintiff's

12  treating physicians' opinion that Plaintiff's functional capacity restrictions and

13  limitations are total and permanent.  As Hartford's own consultant, Dr. Grattan

14  obviously would have if he could.

15

16  **G.    <u>Hartford's Benefits Decision Was Incorrect Because It Ignored Statements from Plaintiff and His Family</u>**

17

18      63.    Under the Ninth Circuit's ERISA disability decision, *Kibel v. Aetna*

19  *Life Ins. Co.*, 725 F.App'x 475, 2018 WL 832870 (9th Cir. Feb. 13, 2018), when

20  deciding his appeal, Hartford was required to take into account his own (and

21  witness) subjective self-reports and statements of Mr. Pratt's disabling symptoms.

22  But Hartford and its medical consultants failed to do that, catering to its conflict of

23  interest and abusing its discretion, which led it to incorrect deny Plaintiff's PTD

24  claim.

25

26      64.    Hartford ignored several corroborating witness statements from Mr.

27  Pratt's family members.  Plaintiff's wife, Heather Pratt, corroborated his disabling

28  symptoms in her May 27, 2025 personal statement, where she attested:



I have attended many doctor appointments and taken him [my husband Mr. Pratt] to every procedure. All of the doctors have said the same thing to us, the damage is permanent. They may be able [to] alleviate some of the pain and some of the numbness with different methods very temporarily, but he will never be able to function the way he once did. That this is our new normal.

65.    Plaintiff's daughter, Madeline Pratt, provided a personal statement which was attached to his appeal documents.  She attested that: "My dad has been in procedures countless times for pain and complications related to the accident…. But you never get used to seeing your dad walk with a cane and often be crippled by pain and so exhausted by the constant pain that he sleeps more than he is awake. I have memories of beach days with my dad and taking the dogs on long walks, but a lot of my memories are from photos. I miss seeing my dad active, happy, mobile, smiling."

66.    Under ERISA, an insurer such as Hartford, as the Plan's claims administrator, owes fiduciary duties to plan participants like Mr. Pratt to conduct a reasonable investigation.  *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1200 (11th Cir. 2010); *Petrusich v. Unum Life Ins. Co. of Am.*, 984 F.Supp.2d 1112, 1119 (D. Or. 2013).  An insurer cannot delegate its duty to conduct a reasonable investigation to a third party.  The plan administrator must engage in "meaningful dialogue" with the plan participant.  *Id.*  "If the administrator believes more information is needed to make a reasoned decision, they must ask for it."  *Id.*; *see also Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538 (9th Cir. 1990) (The burden is on the administrator to obtain information to make a decision.); *Abatie v. Alta Health Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006) ("A court may weigh a conflict more heavily if, for example, the administrator . . . fails adequately to investigate a claim or ask the plaintiff for necessary evidence.")  Hartford failed to meet its investigation obligations by ignoring these symptom statements.

Case No.:

### H.  Under Ninth Circuit Precedent, Plaintiff Is Per Se Disabled from Performing Even a Sedentary Occupation

67.     The Ninth Circuit has held that, where a claimant's attending physicians agreed he could sit at most four hours per eight-hour workday, he was per se disabled from performing his own sedentary occupation (and any other sedentary occupation) because sedentary jobs require mostly sitting and generally at least six hours per day.  *See Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016).  The *Armani* court reached this decision even though the insurer's medical consultants disagreed with the insured's attending physicians about the claimant's sitting limits.  They concluded, based on reviewing his medical records, that the claimant had no sitting restrictions that would prevent him from performing a full-time sedentary job (when the insurer had contended sedentary work involves sitting most of the time).  The Ninth Circuit placed *no weight* on the insurer's paper review opinions and, despite them, stated there was "undisputed evidence that . . . Armani was unable to sit for more than four hours a day" based on the attending physicians' opinions.  *Id.* at 1164.

68.     The opinion reported to Hartford from Mr. Pratt's attending occupational therapist and functional capacity evaluator, Ms. Buccheri, he can sit at most two hours per day, is even more convincing than the attending physicians' opinions in *Armani*.  Hartford still concluded Mr. Pratt was not disabled from performing a sedentary occupation based on its unreliable "paper reviewers."  The Ninth Circuit *Armani* court placed no weight on paper reviews under similar circumstances and establishes that Hartford's benefits denial is patently incorrect.

69.     Hartford ignored this well-known precedent and denied Mr. Pratt's benefits anyway, obviously catering to its conflict of interest.  Hartford abused its discretion because it ignored this Ninth Circuit precedent that undermines its



decision to deny Mr. Pratt's benefits.

## I.    <u>The Social Security Administration and Plaintiff's Other Disability Insurer, Prudential, Each Concluded He Is Disabled from Any Occupation</u>

70.    On October 19, 2023, the Social Security Administration issued a fully favorable decision in Plaintiff's favor, finding Plaintiff disabled under the Social Security Act.  Administrative Law Judge Paul Coulter determined that Plaintiff could not perform his past relevant work or any work in the entire national economy.

71.    Judge Coulter remarked that Plaintiff had the following severe impairments: cervical degenerative disc disease with cervicalgia and radiculopathy; lumbar degenerative disc disease with spinal stenosis and radiculopathy; arthritis; dorsalgia with thoracic radiculopathy; and an antalgic gait.  After he evaluated the medical opinions by the Social Security Administration's retained experts and Mr. Pratt's in person testimony, Judge Coulter concluded:

> (1) The claimant had the residual functional capacity to perform a reduced range of sedentary work as defined in 20 CFR 404.1567(a);
>
> (2) The claimant was unable to perform any past relevant work (20 CFR 404.1565);
>
> (3) Transferability of job skills was not an issue in this case because the claimant's past relevant work was unskilled (20  CFR 404.1568);
>
> (4) Considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566);
>
> (5) The claimant had been under a disability as defined in the Social Security Act since August 14, 2020, the alleged onset date of disability (20 CFR 404.15209g)).

72.    In evaluating disability in ERISA cases, courts have consistently agreed



that a plaintiff's SSA disability award supports the finding of disability under an ERISA policy. "While the de novo standard of review applies in this case, the Court must take into account the 'weighty evidence' that the SSA found that Plaintiff was disabled." *Rodas v. Standard Ins. Co*., No. EDCV132203, 2015 WL 5156455, at *8 (C.D. Cal. Sept. 1, 2015) (*citing Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011)). Here, the requirements for disability under Social Security rules are similar to those in Hartford's Policy. The Policy requires that Plaintiff cannot perform the duties of any occupation of which he is qualified by education, training, and experience. The SSA rules required Plaintiff to prove an "inability to engage in *any substantial gainful activity* by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), (5)(A). (Emphasis added.)

73.    Moreover, not just the SSA, but another insurance company reached the conclusion that Mr. Pratt is totally disabled from performing any occupation, after careful review of his medical history. Since 2021, Plaintiff has received long-term disability ("LTD") benefits from his disability insurance carrier, Prudential, who reviewed the same medical records provided to Hartford. Prudential retained Dr. Vlachos to perform an IME. Based on Dr. Vlachos's medical opinion supporting disability, Prudential approved Mr. Pratt's LTD claim and has been paying him LTD benefits since February 15, 2021. Prudential concluded that Mr. Pratt was and is disabled from performing his own regular occupation and any other occupation for which he qualifies based on his education and employment history.

74.    For the first twelve months of his receipt of LTD benefits, Prudential determined that Mr. Pratt was eligible to receive benefits because his medical conditions prevented him from performing the material and substantial duties of his



regular occupation and he had a loss in earnings of at least 20% or more.  After February 14, 2022, Prudential determined, based again on a review of Mr. Pratt's medical records and his treating physicians' certifications, that his medical conditions prevented him from performing not just the material and substantial duties of his own regular occupation but the duties of any type of gainful occupation that he had the ability to perform based on his education, training, and experience.

75.    That Plaintiff has already met the heightened disability standard of "any occupation" required by Prudential's LTD policy (and the SSA's standard of any gainful work in the entire national economy), is strong, almost insurmountable evidence that he is disabled under Hartford's similar Policy standard.  This evidence proves that he was and is unable to work in any occupation due to the severe pain and advanced stage of his degenerative medical conditions.

76.    The overwhelming and consistent evidence from Plaintiff's treating physicians, the SSA's finding of disability, Prudential's disability finding, and even Hartford's own medical consultants demonstrates that Plaintiff has been permanently and totally disabled since his accident.  Hartford's disregard of this record shows that it incorrectly denied Plaintiff's PTD benefits claim under a de novo standard of review, abused its discretion, and denied him the full and fair review required by ERISA.

## **FIRST CLAIM FOR RELIEF**

To Recover Benefits Due under ERISA Plan, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest under ERISA Plan – 29 U.S.C. sections 1132(a)(1)(B), (g), 502(a)(1)(B), (g)

(Plaintiff against Hartford and Does 1 through 10)



77.    Plaintiff incorporates the previous paragraphs as though fully set forth herein.

78.    Hartford wrongfully denied Plaintiff's claim for PTD benefits under the Policy.

79.    ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

80.    At all relevant times, Plaintiff has been entitled to PTD benefits under the Plan.  By denying Plaintiff's claim for PTD benefits under the Plan, and by related acts and omissions, Hartford violated, and continues to violate, the terms of the Plan and Plaintiff's rights thereunder.

81.    Hartford has failed to follow even the most rudimentary claims processing requirements of ERISA and the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Hartford to make benefit determinations, no deference is warranted with regard to Hartford's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted").

82.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29



U.S.C. §1104(a)(1)(b). A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan. *See* 29 U.S.C. Section 1104(a)(1). Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants, or its beneficiaries. Hartford's handling of Plaintiff's PTD benefit claim falls far short of these standards.

83.     For all the reasons set forth above, the decision to deny PTD benefits was arbitrary, capricious, wrongful, unreasonable, irrational, incorrect, contrary to the evidence, contrary to the terms of the Plan and contrary to law. Hartford abused its discretion in deciding to deny this claim as the evidence shows its denial decision was arbitrary and capricious. Further, Hartford's denial decision and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008). Hartford's denial of Plaintiff's claim constitutes an abuse of discretion.

84.     Alternatively, Plaintiff has met the burden of establishing he is totally and permanently disabled and that Hartford's denial decision was incorrect under a de novo standard of review.

85.     As a direct and proximate result of Hartford's denial of PTD benefits, Plaintiff has been deprived of his PTD benefit since 2021.

86.     As a direct and proximate result of the denial of his claim for PTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action,

Case No.:



1  and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section

2  1132(g)(1).

3

4       87.    A controversy now exists between the parties as to whether Plaintiff is

5  entitled to PTD benefits as defined in the Plan.  Plaintiff seeks the declaration of this

6  Court that he meets the Plan definition of PTD, and is entitled to benefits under the

7  Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a

8  determination of Plaintiff's claim consistent with the terms of the Plan.

9

10       88.    Plaintiff alleges all of the same conduct against Does 1 through 10 as it

11  does against Hartford in this First Claim for Relief and in this Complaint.

12

13                          **PRAYER FOR RELIEF**

14       **WHEREFORE,** Plaintiff prays that this Court grant the following relief

15  against all Defendants:

16       1.    For all Plan benefits due and owing Plaintiff, including PTD benefits;

17       2.    For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section

18  1132(g);

19       3.    For pre-judgment and post-judgment interest on the principal sum,

20  accruing from the date the obligations were incurred.  *See Blankenship v. Liberty*

21  *Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court

22  may award prejudgment interest on an award of ERISA benefits at its discretion.");

23  *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically,

24  Plaintiff seeks interest at the rate of 10% per annum, pursuant to California

25  Insurance Code Section 10111.2 or whatever rate is permissible by law; and

26       4.    For such other and further relief as this Court deems just and proper.

27

28  ///

Case No.:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  November 17, 2025

**McKENNON LAW**

By:  _____
ROBERT J. McKENNON
JOSEPH S. MCMILLEN
Attorneys for Plaintiff Ryan Pratt

Case No.:

